*FILED*

*JUL 27 2012*

*U.S. DISTRICT COURT*
*CLARKSBURG, WV 26301*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF WEST VIRGINIA

**ROBERT MURRAY, JR.,**

      **Plaintiff,**

v.

      **Civil Action No. 1:12cv08**
      **(The Honorable Irene M. Keeley)**

**MICHAEL J. ASTRUE,**
**Commissioner of Social Security,**

      **Defendant.**

## REPORT AND RECOMMENDATION/OPINION

This is an action for judicial review of the final decision of the defendant Commissioner of the

Social Security Administration ("Defendant" and sometimes "the Commissioner") denying the

Plaintiff's claim for supplemental security income benefits ("SSI") under Title XVI of the Social

Security Act. The matter is awaiting decision on cross motions for summary judgment and has been

referred to the undersigned United States Magistrate Judge for submission of proposed findings of fact

and recommended disposition. 28 U.S.C. § 636(b)(1)(B); Fed. R. Civ. P. 72(b); L.R. Civ. P. 9.02.

## I. PROCEDURAL HISTORY

Summer R. Murray ("Mrs. Murray"), mother of Plaintiff, Robert Murray, Jr. ("Plaintiff"),

protectively filed for childhood Social Security Income Benefits for Plaintiff on March 10, 2009,

alleging disability since September 1, 2007, for attention deficit hyperactivity disorder ("ADHD"),

bipolar disorder, oppositional defiant disorder ("ODD"), and mood disorder (R. 204, 236-51, 270,

281). Plaintiff's application was denied initially and upon reconsideration (R. 53, 54). Plaintiff, by

Mrs. Murray, requested a hearing, which Administrative Law Judge J. Robert Brown ("ALJ") held on

October 14, 2010, and at which Plaintiff, who was represented by counsel, and Mrs. Murray testified

(R. 32, 37-52). On October 20, 2010, the ALJ issued a decision, finding Plaintiff was not disabled

(R. 22-32). Plaintiff timely filed a request for review of the ALJ's decision with the Appeals Council (R. 15). On October 7, 2011, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner (R. 1-3).

## II. FACTS

Plaintiff was born on May 4, 2004, and was three (3) years, four (4) months old on his alleged onset date and six (6) years old on the date of the administrative hearing (R. 40, 204). Plaintiff was in first (1st) grade at the time of the administrative hearing (R. 41).

There are no records prior to October 2008. A Psychosocial/Care Connection Intake Assessment was completed on Plaintiff by Denise Spitzer, M.Ed., of Family Preservation Services, Inc., on October 10, 2008. It was noted that Plaintiff had behavioral problems at school and home. He was aggressive and had non-compliant issues. He had kicked teachers at school; he had hit peers. Mrs. Murray reported to Ms. Spitzer that Plaintiff stated he saw "dead people" or things no one else could see. Mrs. Murray stated Plaintiff was very specific about the people he saw, describing the clothing the person wore and the scar on the person's face (R. 300). Mrs. Murray stated Plaintiff claimed he was at a house where they formerly lived, saw a person there, and that person followed him to their new house (R. 306). Ms. Spitzer noted a Child Protective Services case was opened on the Murray family for abuse, neglect and possible drug use. Mrs. Murray reported Plaintiff walked early and talked at one (1) year of age (R. 300). Ms. Spitzer noted that Plaintiff's father had been diagnosed with bipolar and ADHD but was "not taking no (sic) medications for his diagnosis." Mrs. Murray informed Ms. Spitzer that "Dr. Nuber [had] diagnosed [Plaintiff] with ADHD" and bipolar disorder more than one (1) year earlier. Mrs. Murray reported Plaintiff kicked and hit people at school and had been restrained by teachers. Plaintiff "cusse[d] at his teachers." Mrs. Murray reported that, "[i]n the

past," when she was a patient at Family Preservation Services, she had "admitted" that her husband, Plaintiff's father, had "been physically abusive toward her." Mrs. Murray stated her husband drank two (2) or three (3) beers daily. Plaintiff, according to Mrs. Murray, rode his bike, watched television, enjoyed being outside, played video games occasionally, and "like[d] cars." Plaintiff was good at drawing and helping his younger sister (R. 301). Mrs. Murray listed Plaintiff's home environment, social and family support, transportation needs, and mother and father being unemployed as risks and challenges. Ms. Spitzer noted Plaintiff was bipolar, by history, and had a report of hallucinations (R. 302). Ms. Spitzer noted Plaintiff's primary problem was behavioral problems, secondary problem was social problems, and tertiary problem was sibling conflict. Plaintiff was oriented, times four (4). His speech, appearance, and thought content were within normal limits. His sociability was inappropriate because he bullied others. Plaintiff's appetite varied; he slept for one (1) or two (2) hours per night (R. 303). Mrs. Murray reported Plaintiff medicated with Risperdal. Ms. Spitzer noted Plaintiff's severe symptoms were hostility, violence, poor concentration, hyperactivity, depression, anxiety, defiant behavior, agitation, distractibility, and insomnia/hypersomnia. Plaintiff's moderate symptoms were hallucinations, delusions, impulsivity, poor judgment, and change in appetite. Ms. Spitzer noted Plaintiff could complete school work, complete activities of daily living, maintain relationships, maintain personal safety, administer medications, and access other services with the direct assistance of others (R. 304).

In summary, Ms. Spitzer noted the following:

> Presenting problems in order of priority include: severe behavioral problems include: hostility, violence (throws objects, breaks things), hallucinations (seeing people who are not there), poor concentration, unable to focus, oppositional defiant behaviors[;] depressive symptoms[,] e.g.[,] low self esteem[,] withdrawn[;] anxiety[,] e.g.[,] irritable, unable to sleep[;] hyperactivity[,] e.g.[,] constantly in motion, unable to wind down at night[;] agitation[,] e.g.[,] easily/quick to aggressive behaviors[;]

distractibility[,] e.g.[,] unable to concentrate, unable to sit still[;] insomnia[,] e.g.[,] he only sleeps 1 or 2 a night, toss & turn all night. Moderate behavioral problems include: impulsivity[,] e.g.[,] quickly reacts without thinking[;] poor judgment[,] e.g.[,] he hits, kicks, beets (sic) and throws things[;] change in appetite[,] e.g.[,] he has little to no appetite. [Plaintiff] explained he sees people no one else can. He is very descriptive about who and what he sees. For example: he says he sees a black man with a cut on his face, he described his pants, shirt, and shoes. He claims he was at his old house and has followed him to his new house. His mother stated he has seen other people. He will get angry when his Mom (sic) & Dad (sic) tell him they cannot see them. His mother stated he was diagnosed by Dr. Nuber with Bi-Polar Disorder. While completing [Plaintiff's] initial assessment, he had an outburst. His mother asked/told him to put his jacket on. He (sic) yelling, screaming, cussing, beating on the family van, and he was beating on the van window. He was hitting it with a toy rake. His mother had to take the rake from him and restrain him. He has been in trouble at school for his behaviors. He has kicked his teacher, hit other students and has been removed from his classroom. His mother receives notes everyday from school. He is more aggressive toward his sister. His mother stated she has to watch them carefully because he is aggressive toward her (R. 306).

On October 15, 2008, Dr. Celestino Menchavez evaluated Plaintiff. Mrs. Murray informed Dr. Menchavez that Plaintiff was medicated with clonidine and Risperdal for mood disorders; that Risperdal was "helping"; that Plaintiff was being treated by a child psychologist; and that Plaintiff's father was bipolar. Mrs. Murray requested that Plaintiff's dosage of Risperdal be increased. Dr. Menchavez continued the prescription for Plaintiff's "mood disorder medications started by CMG"; instructed Mrs. Murray to get Plaintiff treated by a psychiatrist; and provided Mrs. Murray information about mood disorder (R. 321).

On November 6, 2008, when Plaintiff was four (4) years, six (6) months old, Tracy L. Cosner-Shepherd, M.S., a licensed psychologist, completed a Preschool Mental Profile of Plaintiff. Plaintiff was "minimally cooperative." Mrs. Murray accompanied Plaintiff during his evaluation and provided information about Plaintiff to Ms. Cosner-Shepherd. Ms. Cosner-Shepherd noted Plaintiff's psychomotor behavior was "mildly deficient." He ambulated without difficulty and without the use of an aid. He became "a bit defiant and cried and would not stay seated" (R. 287).

Plaintiff lived with his mother and father and his eight (8) year old half brother, two (2) year old sister, and five (5) month old sister. Plaintiff's father received unemployment benefits; his mother received $161.00 in child support from his half-brother's father (R. 287). Mrs. Murray informed Ms. Cosner-Shepherd that she was applying for disability benefits for Plaintiff because he had "'problems with learning . . . and getting along with people.'" Mrs. Murray reported Plaintiff had "some problems as an infant" and functional interference manifested at two (2) years of age (R. 288).

Mrs. Murray stated Plaintiff had severe mood swings in which he would "cry one minute and then be happy and laughing hysterically" the next minute. Mrs. Murray stated Plaintiff did not "get along with his siblings." He had "difficulties at school" and he had struck teachers. Plaintiff did "not listen." Mrs. Murray stated Plaintiff seemed angry "all the time," got upset easily, and seemed to be sensitive. Mrs. Murray reported Plaintiff did not "have any fear." Plaintiff had "good" energy with medication; however, without medication, Plaintiff could not "sit still" or focus. Plaintiff destroyed objects when he became upset. He tended to "lie a lot." Mrs. Murray reported he did not know his alphabet and did not "get along" with other kids in preschool. Mrs. Murray stated Plaintiff saw "things," such as people that others do not see (R. 288).

Ms. Cosner-Shepherd reviewed the records from Family Preservation, which contained a psychosocial/care connection intake assessment, dated November 29, 2006, which noted behavioral problems and Plaintiff as "a victim of domestic violence." The assessment contained information about Plaintiff's father's having been charged several times with driving under the influence, his mother's having been "in trouble with the State of Maryland due to drug related charges," and his mother's having been on one (1) year probation. It was noted that a Child Protective Services

worker ("CPS") had been to Plaintiff's home. The assessment contained information that Plaintiff and his mother were victims of physical aggression by Plaintiff's father, who had a "problem with alcohol." The diagnosis of that assessment was for physical abuse and disruptive behavioral disorder (R. 288).

Mrs. Murray reported Plaintiff had received treatment for behavioral issues at Family Preservation, where he had "worked with Denise Spitzer from the age of 2 up to the present with a brief period of nontreatment" and had been diagnosed with attention deficit hyperactivity disorder and bipolar disorder by two pediatricians (R. 288-89). Mrs. Murray denied any CPS involvement or abuse in the home. Mrs. Murray disciplined Plaintiff by putting him in his room when he misbehaved, but he "destroy[ed] the room when she" did this. Mrs. Murray stated her pregnancy and the birth of Plaintiff were normal. She denied any developmental delays for Plaintiff. Mrs. Murray reported Plaintiff had undergone hydrocelectomy surgery at age two (2) years, six (6) months; he had no allergies. Plaintiff medicated with clonidine, Ritalin, and Risperdal. Mrs. Murray informed Ms. Cosner-Shepherd that Plaintiff was in his second year of preschool, "seem[ed] to like school," had some behavioral problems as a student in that he did not always socialize, "seem[ed] to enjoy trying to write his name," and he became "upset" if he was not permitted to play outside. Mrs. Murray described Plaintiff's adaptive functioning as follows: woke for school; mother dressed him; took medication; rode bus to school; ate breakfast at school; returned from school on bus; ate after-school snack; and either played outside or did "not do much of anything." Plaintiff enjoyed bike riding and playing his X-Box; he did "things with the family" on the weekend (R. 289).

Ms. Cosner-Shepherd's mental status examination of Plaintiff produced the following results: Plaintiff was minimally cooperative; he maintained eye contact; he responded adequately initially;

he became "belligerent and resistant when he was not given candy, which eh (sic) demanded to have"; his speech was relevant; his orientation, judgment, recent memory, and concentration could not be assessed due to Plaintiff's unwillingness to cooperate; his mood was indifferent; his affect was broad; his thought process was within normal limits; his stream of thought was organized; he demonstrated no obsessive-compulsive behaviors, phobias, or delusions; his insight was poor; his remote memory was markedly deficient "based on his ability to provide personal information"; and his psychomotor behavior was "mildly deficient due to his behavioral issues toward the later part of the evaluation." Mrs. Murray stated that Plaintiff reported he "[saw] people, but she [said] she has never noticed him talking to anyone." Ms. Cosner-Shepherd noted that Plaintiff was "engaging and cooperative initially and interacted during the interview portion"; however, when he was told that he would have to wait to receive candy prior to the start of the testing, he "became difficult and insistent. When he was not given his way[,] he threw a temper tantrum and refused to cooperate, so mom left with him early without completing the testing" (R. 290).

Ms. Cosner-Shepherd could not compile results to the WPPSI-R and Developmental Test of Visual Motor Skills ("VMI") testing "due to lack of cooperation" by Plaintiff. Ms. Cosner-Shepherd noted the following subjective symptoms as to Plaintiff's mood changes: "difficulty getting along with siblings, peers, and adults"; difficulty listening "at times"; angry; easily upset; appetite fluctuated; "some academic difficulties"; lack of fear; "tendency to destroy things when upset" and to "steal and lie"; and he saw " things that [were] not there" (R. 290). Ms. Cosner-Shepherd's objective findings were as follows: family dysfunction, history of abuse, history of substance abuse issues with both parents, inadequate discipline, and history of behavioral problems which were "most likely related to family environment." Ms. Cosner-Shepherd made the following diagnosis: Axis

I - "Disruptive Behavior Disorder, NOS, (rule out attention deficit hyperactivity disorder, also rule out the possibility of a mood disorder and continued abuse)." Ms. Cosner-Shepherd based her diagnosis of disruptive behavior disorder on Mrs. Murray's report of Plaintiff's "behavioral problems, as well as behavioral problems displayed during the evaluation." Ms. Cosner-Shepherd noted Plaintiff "became upset" and "defiant" during the testing when she would not give him what he wanted and that Mrs. Murray did not discipline him "during his actions and seemed somewhat dumbfounded as to how to handle the situation." Ms. Cosner-Shepherd noted Mrs. Murray denied any abuse in the home, but there were records that documented abuse and CPS's involvement. Ms. Cosner-Shepherd found that ADHD and mood disturbance should be ruled out but that she "suspect[ed] most behavioral issues [were] related to family environment." Plaintiff's prognosis was fair; his cognitive ability could not be assessed due to lack of cooperation. As to Plaintiff's communicative abilities, Ms. Cosner-Shepherd found he communicated clearly, he had no speech impediments, and he did not need to repeat responses or have responses interpreted for him. His posture, gait and coordination appeared to be within normal limits (R. 291). Plaintiff's social functioning was noted as being "initially . . . engaging and cooperative," but was then listed as moderately deficient due to Plaintiff's becoming indifferent and "[throwing] a temper tantrum" when Ms. Cosner-Shepherd did not give Plaintiff candy and his mother complied with his request to leave the examination. As to Plaintiff's social functioning, Ms. Cosner-Shepherd noted Mrs. Murray defined it as "'not good'" due to Plaintiff's not attending church, not being involved in extracurricular activities, not "usually" playing with other children, not "get[ting] along with other kids," hurting other children, and not socializing with children outside the school setting. Plaintiff's

concentration, persistence and pace could not be evaluated due to Plaintiff's lack of cooperation (R. 292).

Mindy Paetow, a staff clinician at Family Preservation Services, completed a Psychosocial Update of Plaintiff on January 5, 2009. Ms. Paetow noted no changes in Plaintiff's living situation, social activities, physical health, or strengths since his last evaluation. Ms. Paetow listed Plaintiff's risk factors as "parents unstable role models – [f]ather unemployed and drinks heavy (sic). Mom is not consistant (sic) with discipline." Ms. Paetow noted Plaintiff was doing well in school "so far." He continued to have "problems focusing when given instructions" (R. 307). Upon examination, Plaintiff was oriented, times four (4). His speech, appearance, thought content, sociability, mood, and perception were within normal limits. It was noted that Plaintiff had no ideations about harming himself or others. Plaintiff was medicating with Risperdal and Adderall. Ms. Paetow noted that Plaintiff continued to have "problems getting along with siblings," was non-compliant with "parents (sic) discipline even though discipline [was] not followed through very well"; continued to have "problems in school with peers"; had attention problems in school; continued to see "dead people"; and continued to "have violent outburst often breaking things in home when he 'expect[ed]' something to happen and it" did not (R. 308).

A Provider & Consumer Demographic Information document was completed by Mindy Paetow on January 14, 2009 (R. 294). She noted Plaintiff's primary problem was behavioral; his secondary problem was social; and his tertiary problem was sibling conflict. Ms. Paetow noted Plaintiff was oriented, times four (4), and his speech, appearance and thought processes were within normal limits. His sociability was inappropriate (R. 296). Plaintiff's symptoms were hostility, violence, poor concentration, oppositional/defiant behavior, impulsivity, poor judgment, depression,

anxiety, hyperactivity, agitation, distractibility, and insomnia/hypersomnia (R. 297). Plaintiff required direct assistance with activities of daily living, school, maintaining relationships, administering medications, maintaining personal safety, and access to other services (R. 298). Plaintiff's scores on the Child and Adolescent Functional Assessment Scale ("CAFAS") were as follows: school and work - 30; home - 30; community - 10; behavior towards other - 20; mood/emotions - 30; self harm - 0; substance abuse - 0; thinking - 10. The caregiver rating scores were as follows: family - material needs - 0; family - family social support - 20; non-custodial material needs - 0; non-custodial social support - 0; surrogate material needs - 0; and surrogate social support - 0. The total CAFAS score was 140 (R. 299).

On January 30, 2009, a Wiley Ford Primary SAT Form was completed by Plaintiff's teacher and principal. It was noted that Plaintiff's motor, conceptual, and language performances were "ok." Plaintiff's behavior was described as "[i]nfrequent outbursts, refusals to cooperate when blocks disturbed by another child, coming to school late, missing bus, schedule is not the same." The interventions that were tried were "[d]e-escalating by talking about problem, redirection, conflict mediation with other child, review (sic) consequences, problem solving with review of rules" (R. 341).

Also on January 30, 2009, a Mineral County Schools Office of Special Education Classroom Teacher Report was completed. Patty Maiers, Plaintiff's Head Start teacher, found that Plaintiff's preferred learning style was visual and auditory. Ms. Maiers rated Plaintiff's classroom performance as follows: frequently attempted new assignments and activities, began assignment after receiving direction, completed assignments after receiving directions by asking for help, completed the required assignment in a given period of time, and remained on task for the required amount of time.

Ms. Maiers rated Plaintiff's interaction with peers and adults as follows: demonstrated the ability to appropriately solve problems in conflict situations "just a little"; frequently responded appropriately to friendly teasing; interacted appropriately with adults throughout the school day; used communication skills to maintain positive interpersonal relationships with peers and adults; demonstrated appropriate behavior in a large academic group setting; always demonstrated appropriate behavior when moving with a group; and demonstrated appropriate behavior in a small academic group setting. Ms. Maiers noted that Plaintiff's whole day was "throw[n] off" only when he arrived at school late. Ms. Maiers listed Plaintiff's strengths as follows: Plaintiff could tell why "we have rules," name six (6) numbers, name nine (9) shapes, name all colors, except black, and name sixteen (16) upper and lowercase letters. Ms. Maiers listed Plaintiff's weaknesses as follows: using coping skills, being physically aggressive and argumentative, and "writing letters – directionality (mother)" (R. 343).

On February 2, 2009, Mrs. Murray completed a Mineral County Schools Office of Special Education Developmental/Social History form. Mrs. Murray wrote that Plaintiff had behavior problems and "problems controlling his anger." She noted Plaintiff had no serious health problems. Mrs. Murray listed Plaintiff's medications as Risperdal, a mood stabilizer, and clonidine, a sleep aid. Mrs. Murray wrote that Plaintiff could sometimes get along with other children, but he had "trouble understanding that it can't always be his way." Mrs. Murray listed Plaintiff's special interests and hobbies as "projects," helping his father work, playing video games, and "learn[ing] new things." Mrs. Murray noted she was concerned about Plaintiff's performance in school because she felt he did not "seem to be doing the things that some other kids [could] do, like ABC's (sic), writing letters

and numbers." Mrs. Murray noted that if Plaintiff chose "not to do something and you [kept] asking him to do it, he [would] lose his temper and it [was] hard to get him back under control" (R. 342).

On February 24, 2009, Plaintiff, who was four (4) years old, was evaluated by Dr. Elmaslias Menchavez for mood disorder. Dr. Menchavez found Plaintiff's diet, nutrition, dental, and elimination habits were normal. Dr. Menchavez noted Plaintiff could write his name, could hop, knew four colors, had clear speech, and played board and card games. Dr. Menchavez also noted Plaintiff "[got] along with other children" in school; he had no behavior problems. Plaintiff medicated with Methylin, clonidine, and Risperdal. During the evaluation, Plaintiff was alert and interactive (R. 317). Dr. Menchavez's examination of Plaintiff's head, eyes, ears, nose, mouth, neck, respiratory system and cardiovascular system, abdomen and musculoskeletal system was normal. Dr. Menchavez diagnosed mood disorder; he prescribed Risperdal, Methylin (ADHD) and clonidine (ADHD); he referred Plaintiff to the psychiatry department of West Virginia University (R. 318).

On March 9, 2009, Lizzie MacGray completed an evaluation of Plaintiff for the Mineral County Board of Education upon referral by Plaintiff's Head Start teacher, Patty Maiers, as part of Plaintiff's Individualized Education Program ("IEP"). The Battelle Developmental Inventory Screening ("BDIS") was administered to Plaintiff. Ms. MacGray noted Plaintiff was "immediately comfortable with the testing environment and completed the testing tasks without hesitation. He was very eager to perform well and enjoyed when the evaluator praised his good work." Ms. MacGray found Plaintiff's "performances in most test domains were appropriate for his age." His strengths were in the adaptive, communication and cognitive areas; his weaknesses were in the motor and personal-social areas, "specifically the perceptual and adult interaction areas." In the adaptive area, Plaintiff showed "a lot of independence and [was] confident in his abilities to complete a number

of tasks." Plaintiff could feed himself, use the bathroom on his own, dress himself and blow his nose. It was noted that Plaintiff should "continue to work on using appropriate behavior in public settings and asking permission to use other's possessions." In the personal-social area, it was noted that Plaintiff often did a "good job of following classroom rules until something [did] not go his way." He did not enjoy being read to by an adult; he often tried to avoid playing with many friends. In the communication area, Plaintiff responded to "who and what questions" and conversed on subjects for more than five (5) "turn taking exchanges." Plaintiff used plural forms ending in the /ez/ sound; expressed his wants and needs with words; and understood simple possessive words and plural forms (R. 369). In the motor area, Plaintiff excelled in most gross motor activities; was one of the fastest students on the playground; easily ran without falling; stacked cubes vertically; hopped on one (1) foot without support; and folded paper (R. 369-70). In the cognitive area, Plaintiff was successful in searching for a removed object, finding hidden objects in pictures, attending to an activity "for at least 5 minutes," repeating multiple digit sequences, and naming colors. Ms. MacGray found there was a "need for [Plaintiff] to receive special education services due to delays in personal-social and motor areas." The results of the BDIS showed that Plaintiff was performing above his age level in many areas. Ms. MacGray found it would "benefit [Plaintiff] to have a behavior plan in place and to receive extra help with fine and perceptual motor tasks." She opined that "[t]hese services will help him to reach his highest potential in the personal-social and motor areas" (R. 369-70).

The March 20, 2009, Eligibility Committee Report read that Plaintiff was a student at Wiley Ford Primary School and that Plaintiff's area of exceptionality was developmental delay in his physical development, including his fine motor skills, and his social, emotional, and affective development. It was noted that Plaintiff needed special education (R. 323-24).

An IEP was completed on Plaintiff on March 20, 2009; he was eligible for pre-school special needs. The section titled "Narrative Description of Present Levels of Academic Achievement and Functional Performance" was the content of Ms. MacGray's March 9, 2009, evaluation. (See above and R. 329-30). He was scheduled to be reevaluated for this eligibility on May 4, 2010 (R. 327, 329-30, 331-32). The following annual goals were noted in the IEP: Plaintiff would be given anger management strategies and would be able to effectively apply them by June, 2009 (R. 333). It was noted that Plaintiff would engage in an early childhood program with typical peers, at least eighty percent (80%) of the time and he would not engage in special education or related services (R. 336).

On March 20, 2009, a Mineral County Schools Office of Special Education Student Observation Report was completed by Lizzie MacGray, as a component of Plaintiff's IEP. Ms. MacGray found, on a continuum, Plaintiff was more oppositional than accepting of authority, more uncooperative than cooperative, more uninterested than interested, more overactive than underactive, and more sloppy than neat. She found Plaintiff was equally on task and off task, equally attentive and inattentive, equally quick and slow to respond, equally confident and not confident, and equally socially confident and shy. Ms. MacGray found Plaintiff was more independent than dependent. Ms. MacGray made the following observation:

> [Plaintiff] is very active on the playground. He was running for the entire recess time & had his hands on another child about 75% of the time. He chose to play with the same 3 boys the whole time & got agitated if someone new tried to play with him. He was very physical w/his friends (pulling, tackling) and when asked to be less physical by an adult would comply at first & then return to the rough behaviors. [Plaintiff] would look @ the adults to see if they were watching him before "acting out" after the warning (R. 344).

An undated Behavior Summary form from Mineral County Schools was completed on Plaintiff. It was noted that someone disagreeing with Plaintiff while on the playground or his being

off schedule were conditions that increased combative, aggressive actions, such as hitting, kicking, and throwing items. Plaintiff would stick out his lip, make a fist and have an angry face. He would not allow anyone to touch him and he would "go off by himself." When Plaintiff behaved in this manner, he would have to "sit until he [was] calm"; the teacher talked to him "about what he could have done instead"; and he was told the consequence of his behavior. The reason for this behavior was listed as Plaintiff's obtaining a friend with which to play and avoiding going to school (R. 339).

An undated Intervention Strategies form from Mineral County Schools was completed on Plaintiff. Effort would be made to make Plaintiff aware of his schedule, get Plaintiff to ride the bus, and teach Plaintiff social skills. When Plaintiff's behavior was demonstrated, the teacher would remind him of anger management techniques to use or could offer a drink of water or ask Plaintiff to do a chore to distract him. If Plaintiff was aggressive, he would be "placed in a designated spot . . . with a timer" as a consequence (R. 340).

On April 6, 2009, Patty Maiers, Plaintiff's Head Start teacher, completed a Teacher Questionnaire. In the "Acquiring and Using Information" section, Ms. Maiers noted that Plaintiff had a slight problem with comprehending oral instructions. He had no problem understanding school and content vocabulary. He had no problem comprehending and doing math problems; Ms. Maiers specifically noted that Plaintiff was "very good at math." Plaintiff had a slight problem understanding and participating in class discussion. Ms. Maiers wrote that Plaintiff "usually [did] not want to participate" in such activity. Plaintiff had a slight problem providing organized oral explanations and adequate descriptions and recalling and applying previously learned material. Plaintiff had no problem using new material. He had a serious to very serious problem applying problem-solving skills in class discussions. Ms. Maiers noted that she "[felt] [Plaintiff] really

need[ed] to learn coping skill[s] to get along ie. (sic) problem solve conflicts with his peers.  We always talk about using our words/manners to say "please" when wanting a toy" (R. 256).  In the "Attending and Completing Tasks" category, Ms. Maiers noted she had observed no problems in the domain and that Plaintiff's functioning appeared to be age appropriate (R. 257).  Ms. Maiers made the following findings in the "Interacting and Relating with Others" section of the questionnaire: Plaintiff had a slight to obvious problem with playing cooperatively with other children because he could become aggressive, on a daily basis, when playing outside; Plaintiff had a slight to obvious problem with making and keeping friends on a daily basis in that he only "like[d] . . . a neighbor"; Plaintiff had a very serious problem in expressing his anger in that he would hit others and throw objects on a weekly basis; Plaintiff had a serious problem with interpreting meaning of facial expression, body language, hints, and sarcasm; and Plaintiff had a slight problem with asking permission appropriately and following rules in the classroom, when playing games and when participating in sports.  Plaintiff had no problem in seeking attention in an appropriate manner, respecting and obeying adults in authority, relating experiences and telling stories, using language appropriate to the situation and listener, introducing and maintaining relevant and appropriate topics of conversation, taking turns in a conversation, and using adequate vocabulary and grammar to express thoughts and ideas in general, every day conversation.  The behavior modification strategy that was implemented for Plaintiff was a "[s]imple behavior plan – circle happy/sad face for morning, afternoon midday attitude."  Ms. Maier's further noted that Plaintiff "prefer[red] to play with one boy, a neighbor. He [did]  not like [the neighbor] to play with anyone else. He [was] not able to explain how someone [was] mean – but [would] come and tell me a child [was] mean to him" (R. 258).  Ms. Maiers found "almost all" of Plaintiff's speech was understandable (R. 259).  Ms.

Maiers found Plaintiff had no problems in the "Moving about and Manipulating Objects" and "Caring for Himself" domains (R. 259-60). Ms. Maiers noted that Plaintiff's functioning changed after he took medication in that he was "[n]ot as combative, calmer, behavior varie[d] if his day is altered – late getting to school, meds given late." Ms. Maiers noted that when Plaintiff was "with other students in the Block Center who have trouble sharing or who may accidentally knock down his blocks[,] he [could] become pretty angry. We [gave] him some ideas to help – such as the other child saying 'I'm sorry' or have the other child help(sic) to rebuild his blocks. He [would] come to me and tell me now but if he [did] not[,] he [would] push or hit" (R. 261).

On May 11, 2009, Joseph A. Shaver, Ph.D., completed a Childhood Disability Evaluation Form. He listed Plaintiff's impairment as ADHD. He found that the impairment, or combination of impairments, was severe, but did not meet, medically equal, or functually equal the listings (R. 347). Dr. Shaver relied on the January 5, 2009, report from Family Preservation Services, Ms. Maiers' April 6, 2009, teacher's questionnaire, and the March 9, 2009, BDIS (R. 352). Dr. Shaver opined that Plaintiff had "less than marked" limitations in his ability to acquire and use information, attend and complete tasks, interact and relate with others, move about and manipulate objects, and care for himself (R. 349-50).

On June 1, 2009, an annual review of Plaintiff's IEP was completed. It was noted that the IEP for Plaintiff would "consider the use of positive behavior interventions, supports and strategies to address the behavior," which impeded his learning or the learning of others (R. 354). It was noted, on April 23, 2009, and included in the IEP, that Plaintiff was .

> . . . making a lot of progress academically and behaviorally. The behavior plan is working well with him and his teachers have seen a decrease in the number of his displays of potentially dangerous (to himself or others) behaviors. The few times he has had to sit for 5 minutes in "time out" he has done so without struggle and has

gotten up from them calmer. [P]laintiff has been making it to school on time and this has greatly reduced the problems he had leaving his mother and starting the school day. [P]laintiff knows all of his colors, shapes, and nearly all of the alphabet. He can write his name, but does not add details to his pictures and does not have great control of his strokes using writing utensils. Can print 31 of 52 letters, knows 6 sounds, has trouble focusing (needs to be closely monitored for re-direction), trouble maintaining friendships, demonstrates agression (sic) physically instead of verbally (according to his classroom teacher) (R. 356).

Plaintiff was evaluated by a physician at the Physicians Office Center at United Hospital Center on July 14, 2009,for possible mood disorder. Mrs. Murray reported Plaintiff was angry and aggressive. She reported Plaintiff had hit a neighbor with a rake. Mrs. Murray reported Plaintiff, on some days, would eat nothing and, on other days, ate "all day long." Plaintiff stated he played with a play station, rode a bicycle, and threw a frisbee (R. 379). Plaintiff's general health was listed as "good" (R. 380).

Susannah Poe, Ed.D., of the Klingberg Neurodevelopmental Center, evaluated Plaintiff on July 14, 2009. Dr. Poe noted Plaintiff was a "cooperative child during most of" their clinic time until he was made to stop playing a game; he threw paper, shouted that he wanted to leave the evaluation room, and "flipped" a chair. "His behavior continued to escalate from that point." Mrs. Murray put Plaintiff in "time out"; he complied. Mrs. Murray informed Dr. Poe that she was concerned about Plaintiff's "behavioral outbursts and aggressiveness with children and adults." Mrs. Murray reported Plaintiff had received two (2) years of therapy with Family Preservation, medicated with Risperdal and clonidine, had a behavioral plan at school, and had "some trouble with learning." Dr. Poe found Plaintiff did not meet the criteria for autism as he had no delays in development. Dr. Poe "believe[d] that [Plaintiff] [was] demonstrating behaviors of oppositional defiant disorder and a possible mood disorder." Dr. Poe noted she would suggest to Dr. Menchavez the possibility of Plaintiff consulting with a child psychiatrist. Dr. Poe noted Plaintiff "would also benefit from a child therapist for

behavior modification therapy as well as parent training." Dr. Poe also noted that Plaintiff was "going to require intensive support in home and in school to be successful in managing his behavior." She suggested Plaintiff's parents "should contact the Board for another IEP to discuss these developmental scores and to develop a more appropriate placement than a typical classroom for [Plaintiff] where his learning deficits as well as his behaviors can be managed." Dr. Poe found Plaintiff would "require well-trained, one-to-one support" (R. 381).

On August 27, 2009, Frank Roman, Ed.D., completed a Social Security Administration Childhood Disability Evaluation Form relative to Plaintiff. He listed Plaintiff's impairments as ODD and disruptive behavior disorder. He found Plaintiff's "impairment or combination of impairments is severe, but [did] not meet, medically equal, or functionally equal the listings" (R. 382-83). Dr. Roman found Plaintiff had less than marked limitations in acquiring and using information (cognitive, communication, and adaptive abilities were noted as a strength on IEP), attending and completing tasks (observation notes read that Plaintiff attended well until "things do not go his way and then he act[ed] out and need[ed] help to refocus and calm self to complete task"), interacting and relating to others (adaptive behavior was rated a strength and Plaintiff did well when medicated), moving about and manipulating objects (very good gross motor skills and "making progress" on fine motor skills as per observation notes), and caring for himself (R. 384-85). Dr. Roman relied on the May, 2009, Shaver psychological evaluation, the March 9, 2009, MacGray evaluation, and the July 14, 2009, Poe evaluation (R. 385, 387).

On September 15 and 29, 2009, Disa Mikula, M.S., a Mineral County school psychologist, completed a Confidential Report on Plaintiff. Plaintiff was referred for evaluation "as part of his triennial review as he transition[ed] out of the Preschool Special Needs Program." Ms. Mikula noted

that Plaintiff had been recently diagnosed with ODD. Ms. Mikula administered the Wechsler Preschool and Primary Scale of Intelligence, Third Edition ("WPPSI-III"), test to obtain an estimate of Plaintiff's intellectual functioning. Plaintiff's overall IQ score fell in the average range, at the twenty-fifth (25th) percentile. His verbal IQ fell in the average range, at the forty-fifth (45th) percentile. Plaintiff's long-term memory and vocabulary fell in the fiftieth (50th) percentile; his word reasoning fell in the thirty-seventh (37th) percentile. Plaintiff's perceptual reasoning (performance IQ) fell in the average range, at the twenty-fifth (25th) percentile. Plaintiff's abstract visual reasoning was at the fiftieth (50th) percentile and his visual analysis and synthesis and information processing were at the twenty-fifth (25th) percentile. Plaintiff's processing speed IQ fell in the low average range, at the twenty-first (21st) percentile. His visual discrimination ability was scored at the fiftieth (50th) percentile and his short-term visual memory was scored at the ninth (9th) percentile (R. 433-34, 436). Plaintiff's results on the Wechsler Individual Achievement Test, Second Edition ("WIAT-II"), were as follows: reading – Plaintiff scored below average (twenty-first (21st) percentile) "on tasks that required him to name alphabet letters and identify and generate letter sounds and rhyming words"; mathematics – Plaintiff performed below average (thirteenth (13th) percentile) on identifying and writing numbers and counting; written language – Plaintiff performed below average (tenth (10th) percentile) on writing his name and printing letters that correspond with sounds (R. 434, 436).

Ms. Mikula made the following findings:

. . . . [Plaintiff's] overall cognitive ability score falls in the [a]verage range, at the 25th percentile. He evidenced average scores in all areas of cognition (verbal, visual-perceptual) with the exception of one area measuring short-term memory. The results from academic achievement measures in beginning reading, written language, and mathematics skills, yield scores falling below average. Based on memory deficits in addition to significant academic struggles in reading and written language,

20

it appears that RJ continues to need specialized services through the Specific Learning Disabilities Program (R. 435).

On October 20, 2009, Plaintiff presented to Dr. Thomas for psychiatric care. Dr. Thomas noted Plaintiff was five (5) years old, in kindergarten, and had problems with aggression. Dr. Thomas noted Plaintiff had been "seen [at] Klingberg Center & had testing done suggesting mild depression, ADHD & disruptive" behavior. Dr. Thomas also noted Plaintiff had been medicated since he was three (3) years old and, with an increase in the Risperdal dosage, "things better but still tantrums, outburst & his face looks like a different child. Clonidine helps sleep." Upon examination, Dr. Thomas noted Plaintiff was alert and oriented, times four (4). Plaintiff was pleasant and cooperative. His mood was good; his affect was congruent. Dr. Thomas questioned whether Plaintiff experienced visual hallucinations by noting he had "told mom of seeing things several times - mostly people - last night he saw footprints all through the house that were [not] there in the a.m." Dr. Thomas diagnosed ADHD, ODD and disruptive behavior; he noted that diagnoses of mood disorder and psychosis needed to be ruled out. Dr. Thomas ordered copies of Plaintiff's test results and refilled his medication prescriptions (R. 426, 432).

On November 17, 2009, Plaintiff reported to Dr. Thomas that his sleep was "ok" with medication. Dr. Thomas described Plaintiff's conditions as ADHD, ODD, and disruptive behavior. He noted he needed to rule out mood disorder. Dr. Thomas noted Plaintiff continued to have tantrums at school. He had increased aggression. Dr. Thomas noted Risperdal "worked better" and increased Plaintiff's dosage of that medication. He also prescribed clonidine and Methylin (R. 425).

Dr. Thomas evaluated Plaintiff on January 5, 2010. Plaintiff's impulse control was listed as "poor." His mood was "good"; his affect was congruent. He had no hallucinations or preoccupations. Dr. Thomas described Plaintiff's conditions as ADHD, ODD, and disruptive

behavior. He noted mood disorder needed to be ruled out. Mrs. Murray reported Plaintiff "just seem[ed] sad a lot (sic)"; he cried and was "hateful." Dr. Thomas "add[ed] Prozac" and instructed Plaintiff to return to his care in one (1) month (R. 423).

On February 17, 2010, Plaintiff was evaluated by Dr. Thomas. Plaintiff's mood and sleep were labeled as "good." Plaintiff's affect was congruent. Plaintiff had appropriate judgment, reasoning, appearance and impulse control. He had no suicidal or homicidal ideations, hallucinations, preoccupations, or delusions. Dr. Thomas noted Plaintiff had ADHD, ODD, disruptive behavior and mood disorder. He medicated with Prozac, Methylin, Risperdal, and clonidine. Dr. Thomas instructed Plaintiff to "try stopping Risperdal & con't other meds." He noted Plaintiff was "doing better [with] Prozac. He [was] doing better in school." Plaintiff was instructed to return to Dr. Thomas in one (1) month (R. 422).

Plaintiff did not keep his March 16, 2010, appointment with Dr. Thomas (R. 421).

Plaintiff's IEP was reviewed on May 4, 2010 (R 404-115). The narrative description of Plaintiff's levels of academic achievement and functional performance was as follows:

> The beginning of Kindergarten (sic) was very good for [Plaintiff]. He was able to control his potentially dangerous behaviors or the teacher was able to diffuse him before it became an outburst. In the last six weeks (sic) we have really seen a change in [Plaintiff's] behavior. He gets angry very easily and is defiant when he doesn't want to do what is asked of him. His classroom teacher is finding it harder to keep [Plaintiff] calm. [Plaintiff] frequently has trouble keeping his hands to himself. [Plaintiff] is left handed and that seems to present some problems for him with motor skills and formation of letters. He has a hard time practicing his letters. He wants immediate gratification. Math scores are strong. He hasn't dropped below an 80% the entire year. Last six weeks he had a grade of 90%. Reading is getting better for him. Sight words are still a concern because he cannot sound them out. But he is able to sound unknown words out when he comes across them. [Plaintiff's] classroom teacher sees some restlessness in him at times. He also has difficulty raising his hand to ask a question (R. 404).

It was decided that Plaintiff would receive occupational therapy for one-hundred-twenty (120) minutes per month (R. 414).

On May 12, 2010, Janet M. Dignan, a licensed and registered occupational therapist, completed an Occupational Therapy Evaluation of Plaintiff's motor, visual motor and sensory processes. Ms. Dignan noted Plaintiff "scored a standard score of 87 on the VMI with an age equivalent of 5 years and 2 months." Ms. Dignan noted that Plaintiff was quiet, but responded to the therapist. Plaintiff "appeared to try his best with each task though[,] on occasion[,] he would say he did not want to do a particular task. With some redirection, he would continue." Upon evaluation of Plaintiff's fine motor skills, Ms. Dignan noted Plaintiff's left hand dominance was well established; he could use a tripod grasp on a pencil; he stabilized the paper with his right hand; he held scissors in his left hand to cut; his cutting appeared choppy and rushed; he was able to cut within one-fourth (1/4) inch accuracy. (R. 400). His hand strength was fair; he tired after a few minutes of working; he used lateral pinch to pull apart pop beads; used pad-to-pad pinch when connecting pop beads; he was able to lace small beads, use a pickler, and crumble a small piece of paper. Plaintiff was able to put nine (9) pieces into a puzzle board independently. Plaintiff was able to print his first name in all capital letters, "with fair letter formation," and print cat and dog. He recognized letters when they were presented to him randomly. He was resistant to work on letter formation with the therapist (R. 401).

Upon examination of Plaintiff's perceptual skills, Ms. Dignan noted Plaintiff "appear[ed] to have integrated the basic pre-writing strokes; visually attended to what he was doing with his hands; and used his eyes and hands together well. Ms. Dignan found the following: Plaintiff could "spontaneously cross midline during tasks"; showed difficulty imitating hand posture when hands

were out of or in visual range; demonstrated fair awareness for his hands and for how they moved; could sit balanced in a chair; could move "around the school" without losing his balance; could remain balanced when squatting and picking up something off the floor and return to a standing position; and could sit upright; He "did prefer to stand quiet (sic) a bit during the evaluation." Plaintiff demonstrated no "unusual response to visual, auditory or tactile stimuli" (R. 401).

Ms. Dignan noted that Plaintiff's teacher completed a Sensory Processing Measure of Plaintiff and found Plaintiff had "definite dysfunction in the area[] of VISION." Plaintiff became "distracted by nearby visual stimuli"; he did not always look at the person who was speaking to him; he "always stare[d] intensely at people or objects." As to Plaintiff's "touch," he "frequently" became distressed by accidental touching or touched classmates inappropriately. Plaintiff "occasionally" did not "tolerate messy hands or dirty clothes"; however, he did not always "clean off mouth/face." Relative to Plaintiff's "social functioning," it was noted Plaintiff had difficulty working "as part of a team, . . . [and] resolving peer conflicts without teacher intervention" but "occasionally . . . play[ed] with peers and maintain[ed] appropriate personal space." As to his "hearing," Plaintiff "occasionally" showed distress with loud noises and sounds of singing; did not respond to new sounds or voices; hummed or made noises during "quiet times," and yelled, screamed or made unusual noises to himself. In the area of "body awareness," Plaintiff was "noted to always run, hop or bounce instead of walking, occasionally [would] spill contents of open containers, [would] chew on items, jump[ed] or stomp[ed] on stairs, or move[d] chair roughly." In the "balance and motion" area, it was noted that Plaintiff "frequently rock[ed] or fidget[ed] in his chair, frequently slump[ed] or lean[ed] on desk, occasionally [ran] along the wall when walking, wrap[ped] his legs around chair legs or [fell] out of chair, has poor coordination or appear[ed] clumsy." It was noted, in the

"planning and idea" area, that Plaintiff frequently did not perform consistently in his daily tasks; he was unable to solve problems; he failed to complete tasks with multiple steps, he showed difficulty imitating movement games or songs, he occasionally did not complete a task or he did not perform the task in the proper sequence, and he showed poor organizational skills (R. 402).

Ms. Dignan summarized Plaintiff's strengths as "functional grasp on pencil," "good skill for crossing midline," "willing to try new tasks," and "independent self care tasks." She summarized Plaintiff's needs as "improve hand strength for improved endurance for classroom activities," "develop hand separation skills for improved scissor skills," "master letter formations," and "improve daily to process sensory information on a daily basis." (R. 402). To improve hand weakness that he experienced "as he tires after working [with his hands] for a few minutes," Ms. Dignan recommended Plaintiff build with Legos and Kinex; push a pipe cleaner through a small hole; and work with pop beads, mini clips, squirt bottles, tongs or tweezers. To improve Plaintiff's deficiency in letter formation, Dr. Dignan recommended Plaintiff form letters in sand or Cool Whip; on chalkboard; on dry erase board; by using dabbers and color change markers; out of wikki sticks; or with a program, such as "Handwriting Without Tears." Relative to his sensory system , Ms. Dignan recommended the use of "deep pressure, movement breaks, using a special seat cushion to give the sensation of movement, reducing unnecessary environmental stimuli, using a divider to block out over-stimulating stimuli" as "ways to help [Plaintiff] better function in the classroomsetting (sic)" (R. 403).

On May 18, 2010, Dr. Thomas examined Plaintiff. Dr. Thomas found Plaintiff's mood was good; he had no hallucinations or preoccupations; his affect was congruent. His insight, appetite, weight and judgment were the same. He medicated with clonidine for sleep. He also medicated with

Zoloft, Risperdal and Methylin. Dr. Thomas found Plaintiff was "[d]oing well." He noted that "Zoloft is working. Teacher [said] Zoloft helps in school. Grades are better." Plaintiff was instructed to return in three (3) months (R. 419, 477).

Dr. Thomas treated Plaintiff on August 3, 2010. He noted that Plaintiff's mood was good and his impulse control was poor. Plaintiff had no suicidal or homicidal ideations, no hallucinations, no preoccupations, and no delusions. Dr. Thomas noted Plaintiff had problems with anger. Plaintiff was sleeping less and Mrs. Murray informed Dr. Thomas that she had given him an "extra half of clonidine." Dr. Thomas increased Plaintiff's dosage of Risperdal "for anger & see how school goes." Plaintiff was instructed to return to Dr. Thomas in two (2) months (R. 476).

Dr. Thomas completed a Medical and Functional Capacity Assessment of Plaintiff on August 3, 2010. Dr. Thomas noted that Plaintiff presented to him in October, 2009, for a diagnosis of ADHD, combined type, oppositional/defiant disorder and disruptive behavior disorder. Dr. Thomas listed Plaintiff's symptoms as "tantrums, outbursts, hyperactivity," and reduced focus. Dr. Thomas found Plaintiff's impairments had either lasted or were expected to last for twelve (12) months (R. 429). Dr. Thomas found Plaintiff was markedly limited in his ability to attend and complete tasks; extremely limited in his ability to interact and relate with others; was not or slightly limited in his ability to move about and manipulate objects; and was markedly limited in his ability to care for himself. Dr. Thomas did not assess Plaintiff's health and physical well being (R. 430-31).

At the administrative hearing held in October 2010, Plaintiff testified that he rode a bus to school (R. 40). Plaintiff testified he was in first (1st) grade and math was his favorite subject in school. Plaintiff recited his alphabet and counted to ten (10) for the ALJ (R. 41). Plaintiff stated his goal was to be a football player after graduation from college. He owned a cat and a dog (R. 42).

Plaintiff testified he was not assigned chores to complete by his mother. He completed his homework, either on his own or with the assistance of his mother. Plaintiff stated he was "very good" at video games. He participated in organized football, "BMX," and organized baseball (R. 43). Plaintiff testified he was a lineman in football and he was a good hitter in baseball. Plaintiff testified he took medication daily, "[e]very morning and my bedtime it seems." He did not know why he took medication (R. 44). Plaintiff testified he fought with his sisters and brother "a lot." At the conclusion of Plaintiff's testimony, he was instructed by the ALJ to take paper and pen out of the courtroom, where he would be supervised by his father, and continue to draw a picture of his mother. When Plaintiff was told he could keep the picture, he responded, "Yeah, thanks! Thank you. You're a nice man" (R. 45).

Mrs. Murray testified that Plaintiff was "having a lot of problems" in school with completing his work "alone." She stated that Plaintiff's teacher had to provide "a lot of assistance" to Plaintiff (R. 46). Mrs. Murray stated Plaintiff experienced discipline problems at school "at least two or three times per week." She testified that Plaintiff did not want to remain seated at school; she thought Plaintiff's "main problem . . . [was] he's got a learning disability and he [got] really frustrated that he can't do it. So in my eyes, he's doing something else to get attention because he's unable to do that part on his own." Mrs. Murray stated that she attempted to assist Plaintiff with his homework; he sometimes refused to "sit and do it"; she was attempting to improve that situation (R. 47).

Mrs. Murray testified that her younger daughter was being evaluated for child's benefits for ADHD. Mrs. Murray said Plaintiff medicated with Zoloft, Methylene, Risperdal, and clonidine. Mrs. Murray stated a pediatrician had originally prescribed these medications for Plaintiff, but now

either a "psychologist or a psychiatrist" was prescribing the medication (R. 46). Mrs. Murray testified that Plaintiff was evaluated by Dr. Thomas once a month or every other month (R. 47).

Mrs. Murray testified that Plaintiff "gets really violent with his brothers and sisters . . . some days." She stated a counselor in Dr. Thomas' practice "asked [Plaintiff] why he does it and they've tried to talk to me, they talk to me I think more than him about how to handle it (sic) how to pull him away from the situation to get him calm." Mrs. Murray described Plaintiff's anger toward his siblings, her youngest daughter, specifically, as pushing, shoving and putting his hands around the girl's neck and choking her (R. 48). She testified Plaintiff's dosage of Risperdal had been increased because he was "having so many outbursts." Mrs. Murray described Plaintiff's outbursts as screaming, "swinging" at her, and hitting her, and she had had to "physically put him in the room, shut the door." She testified that Plaintiff had "kicked a hole in [her] wall last week" (R. 49).

Mrs. Murray stated her son had an IEP in school and two (2) special education teachers worked with him, one-on-one, two (2) or three (3) times a week (R. 48-49). One (1) special education teacher assisted Plaintiff with school work with which his regular classroom teacher felt he needed help; the second (2nd) was an occupational therapist, who worked with Plaintiff to strengthen his hands, improve hand coordination, and improve his brain-hand connection so Plaintiff could write properly (R. 49).

Mrs. Murray testified that, when Plaintiff did not pay attention to what she told him to do, she responded by "try[ing] to get him on the right line. . . ."; "seclud[ing] him by himself"; "tell[ing] him to take a deep breath and try to talk about it instead of screaming"; "and if it's to the point where it's uncontrollable at that moment, we put him in a room . . . and we tell him to sit in there and just take a couple of breaths, and then we go in and talk to him about the situation and why he did it" (R.

50). Mrs. Murray testified that she was informed by physicians that Plaintiff's condition would never "go away" but could "only be treated."

Mrs. Murray testified that her husband, Plaintiff's father, was a carpenter and employed "off and on" (R. 50). Mr. Murray was not working at the time of the administrative hearing. None of Mrs. Murray's other children was getting "ADHD money" (R. 51).

## III. ADMINISTRATIVE LAW JUDGE DECISION

Utilizing the five-step sequential evaluation process prescribed in the Commissioner's regulations at 20 C.F.R. § 416.920 (1997), ALJ Brown made the following findings:

1. The claimant was born on May 4, 2004. Therefore, he was a preschooler on March 10, 2009, the date application was filed, and is currently a preschooler (20 CFR 416.926a(g)(2)).

2. The claimant has not engaged in substantial gainful activity since March 10, 2009, the application date (20 CFR 416.924(b) and 416.971 *et seq.*).

3. The claimant has the following severe impairments: attention deficit hyperactive disorder and bipolar disorder (20 CFR 416.924(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 416.924, 416.925 and 416.926).

5. The claimant does not have an impairment or combination of impairments that functionally equals the listing (20 CFR 416.924(d) and 416.926(a) (R. 25).

6. The claimant has not been disabled, as defined in the Social Security Act, since March 10, 2009, the date the application was filed (20 CFR 416.924(a)) (R. 32).

## IV. DISCUSSION

### A. Scope of Review

In reviewing an administrative finding of no disability the scope of review is limited to determining whether "the findings of the Secretary are supported by substantial evidence and

whether the correct law was applied." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990).

Substantial evidence is "such relevant evidence as a reasonable mind might accept to support a

conclusion." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v.

NLRB, 305 U.S. 197, 229 (1938)). Elaborating on this definition, the Fourth Circuit has stated that

substantial evidence "consists of more than a mere scintilla of evidence but may be somewhat less

than a preponderance." Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990), (quoting Laws v.

Celebrezze, 368 F.2d 640, 642 (4th Cir. 1968)). In reviewing the Secretary's decision, the reviewing

court must also consider whether the administrative law judge applied the proper standards of law:

"A factual finding by the ALJ is not binding if it was reached by means of an improper standard or

misapplication of the law." Coffman v. Bowen, 829 F.2d 514, 517 (4th Cir. 1987).

### B. Contentions of the Parties

Plaintiff contends:

1.  The ALJ erred in steps two and three of the three-step sequential evaluation (Plaintiff's brief at pp. 11-13).

2.  The ALJ erred in his analysis of the treating source's opinion (Plaintiff's brief at p. 13).

The Commissioner contends:

1.  Because disability under the Act is based upon functional limitations, not diagnoses, the ALJ properly considered that Murray's impairments did not result in marked limitations (Defendant's brief at p. 6).

2.  The ALJ was not required to give controlling weight to Dr. Thomas' check-box medical source statement (Defendant's brief at p. 10).

### C. Childhood SSI

To qualify for SSI, an individual under the age of 18 must have "a medically determinable

physical or mental impairment, which results in marked and severe functional limitations, and which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. Section 1382(a)(3)(C)(i).

## D. The Steps of the Sequential Evaluation

The ALJ's determination of whether a child is "disabled" under this definition involves a three-step sequential evaluation process. 20 C.F.R. section 416.924. This process requires the ALJ to consider, in order, whether the child: 1) is engaged in substantial gainful employment; 2) has a severe impairment; and 3) has an impairment that meets, medically equals or functionally equals the requirements of a listed impairment. Id. Thus, an ALJ may find a child to be disabled within the meaning of the Social Security Act only if he finds that the child has a severe impairment or combination of impairments that meets, medically equals for functionally equals an impairment listed in Appendix 1. 20 C.F.R. section 416.924(d)(1); 42 U.S.C. 1382c(a)(3)(C)(i).

### 1. Step One

In this case there is no dispute, and it is clear that the child, being a preschooler, was properly found not to have engaged in substantial gainful activity.

### 2. Step Two

At the second step of the sequential evaluation, the ALJ found the claimant had the following severe impairments: attention deficit hyperactive disorder and bipolar disorder. Plaintiff argues that the ALJ failed to find that Plaintiff suffered from the severe impairments of oppositional defiance disorder and disruptive behavior disorder. Plaintiff states his treating physician listed these as diagnoses in his RFC dated August 3, 2010 (R. 429), and that Plaintiff's symptoms and medications

are consistent with these diagnoses. Further, Potomac Highlands Guild, Inc. noted diagnoses of ODD and Disruptive Mood Disorder in October 2009 (R. 426, 432), November 2009 (R. 425), January 2010 (R. 423), and February 2010 (R. 422). These diagnoses were also made by Family Preservation Services (R. 288), State Consultative Physician Tracy Cosner-Shepherd (R. 291) and Susannah Poe, Ed. D. of the Klingberg Neurodevelopmental Center. (R. 381).

The first record, in October 2008, is from Family Preservation Services, and in which it was noted that Plaintiff's mother reported he had been diagnosed with ADHD and bipolar disorder. Later that same month, Dr. Menchavez evaluated Plaintiff. Plaintiff's mother told Dr. Menchavez that her son was being treated for a "mood disorder." She requested a higher dosage of Risperdal but Dr. Menchavez continued the same dosage of Risperdal for "Plaintiff's mood disorder medications started by CMG," and provided her information about mood disorders.

About one month later, psychologist Cosner-Shepherd diagnosed Plaintiff with disruptive behavior disorder, NOS (rule out attention deficit hyperactivity disorder and possibility of a mood disorder and "continued abuse"). She "suspected most behavioral issues were related to family environment."

In February 2009, Plaintiff's special education teacher completed a form stating Plaintiff's medications were Risperdal, for mood stabilization, and clonidine, a sleep aid.

Dr. Menchavez evaluated Plaintiff a second time in February 2009, and repeated the earlier diagnosis of "mood disorder," prescribing Risperdal, Methylin and clonidine.

A "Disability Report " was completed by Plaintiff's mother stating that Plaintiff became disabled on September 1, 2007 (R. 245). Although undated, it did state that Plaintiff's last visit with

the Family Preservation Specialist was in March 2009, and his next was scheduled for May 2009, so clearly the form was completed in early 2009. His diagnoses, and the reasons he was to be considered disabled were listed as <u>ADHD and Bipolar</u>. ( emphasis added).

Plaintiff's Head Start teacher in April 2009, also stated his diagnoses were bipolar and ADD.

Pursuant to his application, Agency reviewing psychologist Shaver found Plaintiff's diagnosis was ADHD, and that it was severe but did not meet, medically equal or functionally equal the listings.

Plaintiff's application for reconsideration was filed on May 27, 2009, agreeing with the diagnoses of ADHD and Bipolar in the prior application and considered by the State agency, but arguing the ultimate determination of non-disability was incorrect because Plaintiff's condition "does make him have limitations in his everyday functioning."

On July 14, 2009, Plaintiff was referred to psychologist Poe by Dr. Menchavez for a possible "mood disorder." Psychologist Poe's diagnostic impression was oppositional defiant disorder. Defendant's general medical condition was "good" and his GAF was 60.[1]

On August 27, 2009, State agency reviewing psychologist Roman listed Plaintiff's impairments as ODD and disruptive behavior disorder, finding his impairments were severe but did not meet, medically equal or functionally equal the listings.

The request for reconsideration was denied on August 28, 2009.

---

[1]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). <u>Diagnostic and Statistical Manual of Mental Disorders</u> ("<u>DSM-IV</u>"), 32 (4th ed. 1994). (Emphasis in original).

In September 2009, a school psychologist noted Plaintiff's recent diagnosis of ODD.

In October 2009, Dr. Thomas diagnosed ADHD, ODD, and disruptive behavior, noting that diagnoses of mood disorder and psychosis needed to be ruled out.

On November 17, 2009, Dr. Thomas again described Plaintiff's conditions as ADHD, ODD, and disruptive behavior (need to rule out mood disorder).

On January 5, 2010, Dr. Thomas described Plaintiff's conditions as ADHD, ODD, and disruptive behavior (rule out mood disorder).

On February 17, 2010, Dr. Thomas noted Plaintiff had ADHD, ODD, disruptive behavior and mood disorder NOS.

From a review of the record, it appears the ALJ erred in finding the plaintiff's impairments to be ADHD and Bipolar, while omitting ODD and possible disruptive behavior disorder or mood disorder. It should, however, first be noted that Bipolar Disorder is a mood disorder, so the ALJ did consider a mood disorder. Further, a "disruptive behavior disorder" is a category for disorders characterized by conduct or oppositional defiant behaviors that do not meet the criteria for Conduct Disorder or Oppositional Defiant Disorder,[2] therefore Plaintiff could only have one of these two diagnoses. The only omission is therefore ODD, with which Plaintiff was diagnosed in July 2009, by a one-time examiner. That diagnosis was carried over to most if not all of Plaintiff's school and

_____

[2]Diagnostic and Statistical Manual of Mental Disorders, page 94 ("DSM-IV") (4th ed. 1994)(This category is for disorders characterized by conduct or oppositional defiant behaviors that do not meet the criteria for Conduct Disorder or Oppositional Defendant Disorder.").

medical practitioners over the next year, however. The undersigned therefore does find it was error to omit this disorder from the list of Plaintiff's impairments.

Although the ALJ erred in failing to consider claimant's ODD at step two of the analysis, the undersigned does not find this error alone justifies remand. Where an ALJ finds at least one impairment or combination of impairments to be "severe" and proceeds with the sequential evaluation, the failure to consider whether any other impairment also qualifies as "severe" is harmless error. This is so because "[a]s long as a claimant has any severe impairment or combination of impairments, the ALJ must proceed beyond step two and consider all of the impairments (including non-severe impairments) at the remaining steps of the sequential evaluation process . . ." In other words, in finding that claimant's ADHD and Bipolar were severe impairments, "the ALJ reached the proper conclusion that the claimant could not be denied benefits conclusively at step two and proceeded to the next step of the evaluation sequence.

More importantly, according to the DSMIV, ADHD and ODD share a numerous traits. For example:

> Features associated with ADHD may include low frustration tolerance, temper outbursts, bossiness, stubbornness, excessive and frequent insistence that requests be met, mood lability, demoralization, dysphoria, rejection by peers, and poor self esteem. Academic achievement is often impaired and devalued, typically leading to conflict with the family and school authorities. Inadequate self-application to tasks that require sustained effort is often interpreted by others as indicting laziness, a poor sense of responsibility or oppositional behavior. Family relationships are often characterized by resentment and antagonism, especially because variability in the individuals' symptomatic status often leads parent to believe that all the troublesome behavior is wilful. A substantial number of children referred to clinics with Attention-Deficit/Hyperactivity Disorder also have Oppositional Defiant Disorder. . . . . . .

Features associated with Oppositional Defiant Disorder include problematic temperaments or high motor activity, low self-esteem, mood lability, low frustration tolerance, swearing . . . There are often conflicts with parents, teachers, and peers. There may be a vicious cycle in which the parent and child bring out the worst in each other. Oppositional Defiance Disorder is more prevalent in families in which . . . harsh, inconsistent, or neglectful child-rearing practices are common. Attention-Deficit/Hyperactivity disorder is common in children with Oppositional Defiant Disorder.

Plaintiff in particular argues that his medications are consistent with the diagnosis of ODD. Significantly, however, after Plaintiff's diagnosis was changed from ADHD and Bipolar to ADHD and ODD, his medications did not change.

Plaintiff also argues in particular that "Clinical findings consistent with these diagnoses are present through in [sic] the record," specifically noting Family Preservation Services' assessment of Plaintiff in 2008 as having hostility, violence, inability to focus and oppositional defiant behaviors, and in January 2009, as continuing to have problems getting along, non-compliance with discipline and problems in school with peers. In January 2009, Wiley Ford Primary Pre-K noted infrequent outbursts and refusals to cooperate when disturbed by other children, and in March of 2009, State Consultative Physician Cosner-Shepherd noted behavioral displays consistent with anger, difficulty listening, tantrums, and mood swings. Despite Plaintiff's argument that all these findings were "consistent" with ODD, however, none of these providers diagnosed ODD, and it was not diagnosed until a one-time examination in July 2009, after which the diagnosis was "adopted" by other providers. As even Dr. Thomas states: "He came to me with dx of ADHD combined type, oppositional defiant d/o and disruptive behavior d/o, rule out depression." (Emphasis added). The

undersigned finds this is substantial evidence that the symptoms of ODD are similar enough to the symptoms of other disorders that even the medical providers disagreed on the diagnosis.

The undersigned finds the omission of ODD from the list of severe impairments therefore does not require remand. To put it simply, at Step Three, the ALJ is required to determine Plaintiff's functional limitations in the six domains. Most, if not all, of the mental impairments with which Plaintiff has been diagnosed over his short lifetime will affect the same domains in the same manner.

### 3. Step Three and Treating Physician Opinion

At step three the ALJ is required to determine whether the child has an impairment or impairments that meet, medically equal or functionally equal the requirements of a listed impairment. Thus, an ALJ may find a child to be disabled within the meaning of the Social Security Act only if he finds that the child has a severe impairment or combination of impairments that meets, medically equals for functionally equals an impairment listed in Appendix 1. 20 C.F.R. section 416.924(d)(1); 42 U.S.C. 1382c(a)(3)(C)(i).

Plaintiff does not argue that he meets or medically equals a listing, and the undersigned agrees he does not. Plaintiff does argue that he functionally equals the requirements of a listed impairment. Defendant contends that the ALJ properly found that Plaintiff's impairments did not meet, medically equal, or functionally equal a listing.

To determine whether a child's impairments functionally equal a listed impairment, the ALJ evaluates a child's functional limitations in six domains: 1) acquiring and using information; 2) attending and completing tasks; 3) interacting and relating with others; 4) moving about and

manipulating objects; 5) caring for himself or herself; and 6) health and physical well-being. 20 C.F.R. section 416.926a(b)(1)(i)-(vi).

The regulations provide that a child is "disabled" if he or she has an impairment or impairments of "listing-level severity" that is an "extreme" limitation in one of these domains or "marked" limitations in two or more domains. 20 C.F.R. section 416.926a(a). A marked limitation in a domain is found when an impairment interferes seriously with a claimant's ability to independently initiate, sustain or complete activities. 20 C.F.R. section 416.926a(e)(2). An extreme limitation in a domain is found when the impairment interferes "very seriously" with a claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. section 416.926a(e)(3).

The ALJ found that Plaintiff was less than markedly impaired in the domain of acquiring and using information. Plaintiff does not argue with this assessment and the undersigned agrees that treatment records show Plaintiff had only some trouble with learning, that his overall cognitive ability scores fell in the average range of intellectual functioning, and that he had strengths in adaptive, communication and cognitive areas.

The ALJ also found Plaintiff less than markedly impaired in the domain of moving about and manipulating objects, and Plaintiff also does not dispute this finding. Again, the undersigned agrees that Plaintiff's impairment, if any, in this area is less than marked. Examination showed Plaintiff rode his bike, played with his X-Box, had normal posture, gait, and coordination, could throw a frisbee, ride a bike, and excelled in most gross motor activities. He was one of the fastest students on the playground, running without falling, hopping on one foot. He would possibly need help only with fine and perceptual motor tasks.

The ALJ also found Plaintiff less than markedly impaired in the domain of health and physical well being. Plaintiff does not dispute this finding, nor does the undersigned. Plaintiff's treatment records do not indicate any physical health issues. His general medical condition was "good." He may have had some difficulty with vision and hearing issues, but not rising to the level of a marked impairment.

## A. Treating Physician Opinion

The dispute in this case lies in the ALJ's assessment of Plaintiff's impairments in the domains of interacting and relating with others, caring for yourself, and attending to and completing tasks. Plaintiff argues that Dr. Thomas, Plaintiff's treating physician, in his RFC, indicated "extreme" limitations in the functional domain of interacting and relating to others and "marked" limitations in the functional domains of attending and completing tasks and caring for one's self. Either one "extreme" or two "marked" limitations would be considered disabling. Plaintiff argues that the ALJ rejected Dr. Thomas' opinion and instead accepted the opinions of the State's examiners, failing to comply with Social Security Ruling 96-2p.

The treating physician's opinion should be accorded great weight because "it reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Mitchell v. Schweiker, 699 F.2d 185 (4th Cir. 1983).

Plaintiff argues that the ALJ's "entire rejection" of Dr. Thomas's opinion was based on his own opinion that Dr. Thomas's opinions "are inconsistent with the claimant's medial [sic] evidence of record" and that the opinions are inconsistent with his "own medical evidence finding that, more

often the (sic) not, the claimant had good mood, congruent effect, only 'poor' impulse control, and

appropriate appearance."

In Craig v. Chater, 76 F.3d 585, 590(4th Cir. 1996), the Fourth Circuit held:

Circuit precedent does not require that a treating physician's testimony "be given controlling weight." Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). In fact, 20 C.F.R. §§ 404.1527(c)(2) and 416.927(d)(2) (emphasis added) both provide,

[i]f we find that a treating source's opinion on the issue(s) of the nature and severity of [the] impairment(s) is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, we will give it controlling weight.

By negative implication, if a physician's opinion is not supported by clinical evidence or if it is inconsistent with other substantial evidence, it should be accorded significantly less weight.

Plaintiff began seeing Dr. Thomas in October 2009, upon referral for "problems with

aggression." It was noted he had been evaluated by the Klingenberg Center which performed testing

suggesting mild depression, ADHD, and disruptive behavior disorder. Dr. Thomas' evaluation

lasted 20 minutes and included no testing. Objectively, Plaintiff was fully alert, pleasant and

cooperative, his mood was good, his affect was congruent and he had no suicidal or homicidal

ideations. It was also noted that Clonidine helped him sleep. As already noted, no testing was done,

the evaluation lasted 20 minutes, and the record included the note: "get copy of testing."

Plaintiff's next appointment with Dr. Thomas lasted six minutes, and was referred to as

"Medication Management." The only mental status checked off was "sleep," which was deemed

"Ok [with] meds." Again there was no testing, although there was a notation that testing was done

at school. His problems included tantrums, increased aggression with sister. Risperdal was working better then and was increased.

Plaintiff's next appointment with Dr. Thomas was rescheduled due to illness.

Plaintiff's next appointment with Dr. Thomas was January 2010, and was also labeled "Medication Management," lasting 10 minutes. His emotional state was good, his affect was congruent, and his impulse control was poor. He again had no suicidal or homicidal impulses, preoccupations or hallucinations. His sleep was still "ok" on medication. His mother said he was "crying" and "hateful," and just "seemed sad a lot." The doctor added Prozac.

In February 2010, Dr. Thomas indicated Plaintiff's mood and sleep were good, his affect was congruent, he had appropriate judgment, reasoning, appearance and impulse control. He had no suicidal or homicidal ideations. His sleep was good. His medication was effective. He was doing better with Prozac "and doing better at school as well."

Plaintiff's next appointment with Dr. Thomas was in March 2010, but he was a "no show."

Plaintiff next saw Dr Thomas in April 2010, for another 10-minute "Medication Management" visit." His mood was good, but his impulse was poor. It was noted the school was requesting another aide for first grade. Prozac now seemed to be making him worse, and his mother stopped his Risperdal. He was tried on Zoloft.

Plaintiff next saw Dr. Thomas in May 2010 for another 10-minute "Medication Management" visit. He indicated Plaintiff's mood was good, he had no hallucinations or preoccupations, his affect was congruent, as were his insight, appetite, weight and judgment. His

sleep was good with medication. He was "doing well." His medications were effective. Zoloft was working and Plaintiff's teacher said he was doing better in school. His grades were better.

Three months later, in August 2010, Dr. Thomas completed the RFC assessment. He had at this point seen Plaintiff six times, once for a 20 minute intake and five times for medication management sessions that lasted 6-10 minutes for a grand total of approximately one hour over the course of ten months. The undersigned cannot say that this is irregular, but is not convinced Dr. Thomas should be referred to as a "treating physician" whose opinion should be entitled to controlling weight. Here, it is not apparent from the record that Dr. Thomas performed any testing or even interviewed Plaintiff for any significant amount of time.

Giving Plaintiff the benefit of the doubt, even if Dr. Thomas is found to be a treating physician, the undersigned finds his opinion as rendered in the RFC is not entitled to controlling or any significant weight. In the RFC, under "Diagnoses," Dr. Thomas candidly notes that Plaintiff "came to him" with diagnoses of ADHD, combined type, oppositional defiant d/o and disruptive behavior d/o, rule out depression. The section that asks the doctor to identify the clinical findings and objective signs supporting the diagnosis is left totally blank. The symptoms are listed as tantrums, outbursts, hyperactivity, decreased focus. Besides checking off the boxes marked "marked" or "extreme," Dr. Thomas provides no other narrative or explanation.

Besides being inconsistent with Dr. Thomas' own medical evidence of record, his opinion is also inconsistent with other substantial evidence, as shall be discussed more fully below.

Further, Plaintiff implies that the ALJ improperly accepted the opinions of the State examiners. 20 CFR § 404.1527(f)(2)(i) provides:

42

Administrative law judges are not bound by any findings made by State agency medical or psychological consultants, or other program physicians or psychologists. However, State agency medical or psychological consultants, or other program physicians or psychologists, are highly qualified physicians and psychologists who are also experts in Social Security disability evaluations. Therefore, administrative law judges must consider findings of State agency medical or psychological consultants, or other program physicians or psychologists, as opinion evidence, except for the ultimate determination about whether you are disabled.

The undersigned finds substantial evidence supports the ALJ's determination that Dr. Thomas's RFC be accorded little weight, because it is inconsistent with the medical evidence of record, and inconsistent with Dr. Thomas's own medical evidence of record. The undersigned also finds the ALJ properly considered the State Agency physician opinions in making his determination.

## B. The Three Domains in Dispute

### 1. Caring for Yourself

This domain involves how well the child maintains a healthy emotional and physical state; how the child copes with stress and changes in the environment; and whether the child takes care of his or her own health, possessions, and living area. 20 C.F.R. section 416.926a(k). Children of Plaintiff's age should want to take care of many of their physical needs by themselves (e.g., putting on their own shoes or getting a snack), and also want to try doing some things they cannot do fully (e.g., tying shoes, climbing on a chair to reach something, or taking a bath.). Early in this age range, it may be easy for the child to agree to do what the caregiver asks, but later, that may be difficult "because you want to do things your way or not at all." Id. at (iii). "These changes usually mean that you are more confident about your ideas and what you are able to do. You should also begin to

understand how to control behaviors that are not good for you (e.g., crossing the street without an adult). Id. Further:

> The following examples describe some limitations we may consider in this domain
>
> . . . .
>
> (i) You continue to place non-nutritive or inedible objects in your mouth;
> (ii) You often use self-soothing activities showing developmental regression (e.g., thumbsucking, re-chewing food), or you have restrictive or stereotyped mannerisms (e.g., body rocking, head banging);
> (iii) You do not dress or bathe yourself appropriately for your age because you have an impairment that affects this domain;
> (iv) You engage in self-injurious behavior (e.g., suicidal thoughts or actions, self-inflicted injury, or refusal to take your medication), or you ignore safety rules;
> (v) You do not spontaneously pursue enjoyable activities or interests;
> (vi) You have disturbance in eating or sleeping patterns.

The ALJ found that Plaintiff had a less than marked limitation in this domain. Dr. Thomas opined that Plaintiff had a marked limitation in this area.

The ALJ noted psychologist-examiner Cosner-Shepherd's report that Plaintiff took his medication and got dressed without help, and an IEP performed at his school that indicated Plaintiff was able to feed himself, use the bathroom himself, dress himself, and blow his nose independently. Dr. Thomas found Plaintiff had a "marked" limitation in this domain.

A Psychosocial Intake assessment in October 2008, indicated Plaintiff's own mother stated Plaintiff rode his bike, watched television, enjoyed being outside, played video games and liked cars. He was good at drawing and helping his younger sister. It was found by the examiner that Plaintiff could complete school work, complete activities of daily living, maintain relationships, maintain personal safety, administer medications, and access other services with the assistance of others.

Ms. Cosner-Shepherd evaluated Plaintiff the next month. Plaintiff's mother said he seemed to like school, seemed to enjoy trying to write his name, became upset if not allowed to play outside. He was able to awaken for school, take medication, ride the bus to school, eat breakfast at school, and return from school on the bus. He enjoyed bike riding and paying his X-Box and did things with the family on the weekend.

In January 2009, an evaluation noted Plaintiff had no ideations about harming himself or others.

Dr. Menchavez found Plaintiff's diet, nutrition, and dental habits were normal.

An evaluation for school IEP indicated Plaintiff could feed himself, use the bathroom on his own, dress himself, and blow his nose.

Plaintiff showed none of the examples of an impairment in that area, reportedly took care of his own personal needs, did not engage in self-injurious behavior and spontaneously pursued activities he enjoyed.

The undersigned finds substantial evidence supports the ALJ's determination that Plaintiff had a less than marked impairment in the domain of caring for himself.

## 2.     Attending and Completing Tasks

This domain concerns how well a child is able to focus and maintain attention, and how well the child begins, carries through, and finishes his or her activities, including the pace at which he or she performs activities and the ease at which he or she changes them. Children Plaintiff's age should be able to pay attention when spoken to directly, sustain attention to play and learning activities, and concentrate on activities like putting puzzles together or completing art projects. The child should

also be able to focus long enough to do many more things by himself, such as getting clothes together and dressing, feeding himself, or putting away toys. He should usually be able to wait his turn and to change his activity when a caregiver or teacher says it is time to do something else. 20 C.F.R. section 416.926a(h). Further:

> The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also the examples so not necessarily describe a "marked" or "extreme" limitation:
>
> (i) You are easily startled distracted, or overreactive to sounds, sights, movements, or touch.
> (ii) you are slow to focus on, or fail to complete activities of interest to you, e.g., games or art projects.
> (iii) You repeatedly become sidetracked from your activities or you frequently interrupt others.
> (iv) you are easily frustrated and give up on tasks, including ones you are capable of completing.
> (v) You require extra supervision to keep you engaged in an activity.

The ALJ found Plaintiff had a less than marked limitation in attending and completing tasks. Dr. Thomas opined that Plaintiff was markedly limited in his ability to attend and complete tasks.

The ALJ cited the Klingberg Neurodevelopmental Center report of July 2009, indicating that Plaintiff was quiet and cooperative during most of the exam, although having a temper tantrum when he did not want to give up a game he was playing. The ALJ also cited an occupational therapy evaluation showing that Plaintiff was willing to try new tasks and was independent at self-care tasks. He also cited an IEP from Plaintiff's school showing that he demonstrates a lot of independence and was confidant in his ability to complete a number of tasks. He was able to search for a removed object and find hidden objects in pictures. He was often able to attend to an activity for at least 5 minutes at a time, and could repeat multiple digit sequences and name colors.

A Special Education teacher reported Plaintiff frequently attempted new assignments and activities, began assignments after receiving directions, completed assignments after receiving directions by asking for help, completed the assignments in the given period of time, and remained on task for the required amount of time. His behavior was "thrown off" only when he would arrive at school late (he was 4 years old). His late arrival in some manner also seemed to throw off his medication schedule.

Ms. Spitzer of Family Preservation Services, found in October 2008, that Plaintiff could complete school work, complete activities of daily living, maintain relationships, maintain personal safety, administer medications, and access other services with the assistance of others.

Dr. Menchavez noted that Plaintiff could write his name, and played board and card games. He was alert and interactive.

Upon referral from Plaintiff's Head Start teacher, Lizzie MacGray completed an evaluation, which indicated Plaintiff was immediately comfortable with the testing environment and completed the testing tasks without hesitation. He was very eager to perform well and enjoyed when the evaluator praised his good work. His performances in most test domains were age-appropriate. He showed a lot of independence and was confident in his abilities to complete a number of tasks. He was successful in searching for a removed object, finding hidden objects in pictures, attending to an activity for at least 5 minutes, repeating multiple digit sequences and naming colors. He was performing above age-level in many areas.

In April 2009, Plaintiff's Head Start teacher indicated she observed no problems in the domain of attending and completing tasks and that his functioning in that domain appeared to be age appropriate.

A May 4, 2009, IEP indicated Plaintiff's teacher noticed he seemed restless "at times."

On May 11, 2009, a State Agency reviewing psychologist opined that Plaintiff had a less than marked limitation in his ability to attend and complete tasks.

The Klingberg Neurodevelopmental Center report indicated Plaintiff was cooperative during most of the evaluation until he was made to stop playing a game. There was no indication of inability to attend to and complete tasks, however.

A second State agency reviewing psychologist opined Plaintiff had less than marked limitation in attending and completing tasks (although noting that he attended well until things did not go his way, and then he would act out and need help to refocus and calm himself to complete the task.)

Based on all of the above, the undersigned finds substantial evidence supports the ALJ's determination that Plaintiff was less than markedly limited in the domain of attending and completing tasks.

3.      **Interacting and Relating with Others.**

This domain concerns how well the child initiates and sustains emotional connections with others, develops and uses language, cooperates with others, complies with rules, responds to criticism, and respects and takes care of the possessions of others. Id.at (I). Children in Plaintiff's age group should be able to socialize with children as well as adults, but begin to prefer playmates

their own age and start to develop friendships with children their own age. They should be able to use words instead of actions to express themselves, and also be better able to share, show affection, and offer to help. They should be able to relate to caregivers with increasing independence, choose their own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision. They should be able to initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speaking clearly enough that both familiar and unfamiliar listeners can understand what they say most of the time. Id. Further:

> The following examples describe some limitations we may consider in this domain. Your limitations may be different from the ones listed here. Also, the examples do not necessarily describe a "marked" or extreme limitation.
>
> (i) You do not reach out to be picked up and held by your caregiver
> (ii) You have no close friends, or your friends are all older or younger than you.
> (iii) You avoid or withdraw from people you know, or you are overly anxious or fearful of meeting new people or trying new experiences.
> (iv) You have difficulty playing games or sports with rules.
> (v) You have difficulty communicating with others: e.g., in using verbal and nonverbal skills to express yourself, carrying on a conversation, or in asking others for assistance.
> (vi) You have difficulty speaking intelligibly or with adequate fluency.

The ALJ opined that Plaintiff had a less than marked limitation in this domain. Dr. Thompson found he had an extreme limitation.

At Plaintiff's intake evaluation (age 4), it was noted Plaintiff had behavioral problems at home and at school. He was aggressive and non-compliant. He kicked teachers and hit peers. He had an outburst at the end of the evaluation when his mother told him to put on his jacket. He yelled, screamed, cussed, and beat on the family vehicle.

One week later, Plaintiff's mother told his doctor that Risperdal was helping.

In November 2008 (4 ½ years old), psychologist Cosner-Shepherd found Plaintiff "minimally cooperative." He was "a bit defiant and would not remain seated." Plaintiff's mother did say that Plaintiff seemed to like school, did not always socialize, and "became upset" if not allowed to play outside. He enjoyed bike riding, playing his X-Box and doing things with the family on weekends.

On mental status exam, Plaintiff responded adequately initially, but became belligerent and resistant when he was not given candy, which he demanded. She reported he was "engaging and cooperative initially and interacted during the interview portion," but became difficult and insistent when told he would have to wait to receive candy. He threw a temper tantrum and refused to cooperate, so his mother took him away without completing the testing. Based on the little interaction she had with Plaintiff, and with Plaintiff's mother's report, Ms. Cosner-Shepherd noted the following subjective symptoms: difficulty getting along with siblings, peers, and adults, difficulty listening at times, angry, easily upset, tendency to destroy things when upset, and stealing and lying. Her objective findings were: family dysfunction, history of abuse, history of substance abuse by both parents, inadequate discipline, and history of behavioral problems "most likely related to family environment."

In January 2009, Plaintiff's clinician noted Plaintiff was doing well in school so far. Upon examination, his speech, appearance, thought content, sociability, mood and perception were within normal limits. He continued to have problems getting along with his siblings, was non-compliant with his parents' discipline "even though discipline was not followed through very well," continued to have problems in school with peers, and reportedly continued to have violent outbursts at home

when he expected something to happen and it did not. Plaintiff's primary problem was behavioral, his second was social and this third was sibling conflict. His sociability was inappropriate.

Plaintiff's teacher and principal completed a form that same month, describing his behavior as "infrequent" outbursts, refusal to cooperate when blocks were disturbed by another child, coming to school late, missing the bus, schedule is not the same. (He was 4 years old).

Plaintiff's Special Education teacher rated Plaintiff's interaction with peers and adults as follows; demonstrated the ability to appropriately solve problems in conflict situations "just a little;" frequently responded appropriately to friendly teasing; interacted appropriately with adults throughout the school day; used communication skills to maintain positive interpersonal relationships with peers and adults; demonstrated appropriate behavior in a large academic group setting; always demonstrated appropriate behavior when moving with a group; and demonstrated appropriate behavior in a small academic group setting. His day was only "thrown off" when he arrived at school late. She did list as a "weakness his being physically aggressive and argumentative."

Dr. Menchavez noted plaintiff got along with other children and had no behavior problems.

In March, 2009, Ms. MacGray completed an evaluation for the Board of Education. She noted Plaintiff was immediately comfortable with the testing environment and completed the testing tasks without hesitation. He was very eager to perform well and enjoyed when the evaluator praised his good work.

He did show weakness in personal-social areas, specifically the adult interaction areas. He should continue to work on using appropriate behavior in public settings and asking permission to

use others' possessions. He did a good job of following rules until something did not go his way. He could converse for more than five "turn-taking" exchanges.

An undated school report noted that someone disagreeing with Plaintiff "or his being off schedule" increased combative aggressive actions, such as hitting, kicking, and throwing. He would stick out his lip, make a fist and make an angry face. Intervention strategies to assist Plaintiff included making him aware of his schedule, getting him to ride the bus (he was still 4), and teaching him social skills.

In April 2009 (4 years old), Plaintiff's Head Start teacher noted Plaintiff had "slight to obvious" problems playing cooperatively with other children; "slight to obvious" problems making and keeping friends in that he only liked a neighbor; had a very serious problem in expressing anger in that he would hit others and throw things on a weekly basis; a slight problem asking permission appropriately and following rules in the classroom, playing games, and when participating in sports. He had no problem seeking attention in an appropriate manner, respecting and obeying adults in authority, using appropriate language, taking turns in a conversation. Ms. Maiers in particular noted that Plaintiff's actions changed after he took his medication in that he was not as combative and calmer. Significantly, his behavior varied if his day was altered – late getting to school or being given his meds late (he was still 4).

State agency psychologist Shaver opined Plaintiff had a less than marked limitation in interacting and relating with others.

In April 2009 (age 4) it was noted in Plaintiff's IEP that he was making a lot of progress academically and behaviorally. His teachers saw a decrease in the number of displays of potentially

dangerous behaviors. The few times he had to sit in time out he did so without struggle and then got up calmer. He had been making it to school on time "and this greatly reduced the problems he had leaving his mother and starting the school day."

In July 2009, Plaintiff (now age 5) was evaluated by Dr. Poe. She noted he was cooperative during most of their time until he was made to stop playing a game. Then he threw paper, shouted that he wanted to leave and flipped a chair. His mother put him in "time out" and he complied. Psychologist Poe's diagnostic impression was oppositional defiant disorder. Defendant's general medical condition was "good" and his GAF was 60, indicating only "moderate symptoms" or "moderate difficulty in social, occupations, or school functioning."[3] Simply put, although Dr. Poe was the doctor who diagnosed oppositional defiant disorder, and had seen a temper tantrum personally, she still found he had only moderate difficulties or symptoms. The undersigned finds this is not consistent with a finding of an "extreme" functional limitation.

In August 2009, a third State agency reviewing psychologist opined that Plaintiff had less than marked limitations in interacting and relating to others (noting he did well when medicated).

Plaintiff's May 2010 IEP (kindergarten) stated he had started out very well, but in the last six weeks there was a change in his behavior. He got angry very easily and was defiant when he didn't want to do what was asked of him. He was also restless "at times."

---

[3]A GAF of 51-60 indicates **Moderate symptoms** (e.g., flat affect and circumstantial speech, occasional panic attacks) **OR moderate difficulty in social, occupational, or school functioning** (e.g., few friends, conflict with peers or coworkers). Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), 32 (4th ed. 1994). (Emphasis in original).

On May 18, 2010, Dr. Thomas examined Plaintiff. Dr. Thomas found Plaintiff's mood was good; he had no hallucinations or preoccupations; his affect was congruent. His insight, appetite, weight and judgment were the same. He medicated with clonidine for sleep. He also medicated with Zoloft, Risperdal and Methylin. Dr. Thomas found Plaintiff was "[d]oing well." He noted that "Zoloft is working. Teacher [said] Zoloft helps in school. Grades are better." Only three months later Dr. Thomas completed the RFC opining that Plaintiff had an extreme limitation in the domain of interacting and relating with others.

During the administrative hearing Plaintiff recited his alphabet and counted to ten. He stated his goal was to be a football player after he graduated from college. He was not assigned any chores by his mother. He completed his homework. He was very good at video games. He participated in formal team football, formal team baseball, and BMX. He took his medication daily. He did say he fought with his sibling s a lot. At the conclusion of his testimony, the ALJ asked him to leave the courtroom and go sit with this father. When he told him he could take paper and pen with him to draw, Plaintiff said, "Yeah, thanks! Thank you. You're a nice man."

The undersigned finds the evidence does not support Dr. Thomas' opinion that Plaintiff's limitation in this area is "extreme." An "extreme" limitation interferes "very seriously" with the child's ability to independently initiate, sustain or complete activities. Most of Plaintiff's teachers, the adults who observed him most frequently (besides his mother, upon whose statements most of the doctors' reports were based), did not complain of extreme behavior, and, except for time outs and special education for learning problems, he appeared to have remained in the regular classroom with the other children. Most of Plaintiff's teachers, who saw him on a continuous, regular, and,

54

in many cases daily basis, opined that Plaintiff was getting much better, and, more significantly, was much better when he was on schedule, did not miss the bus, and got his medication on time. Considering Plaintiff was only 4 years old during most of the reports, the undersigned believes this was more a parental responsibility than Plaintiff's. There is clear and obvious support for this belief in the record, including professional opinions that Plaintiff's behavior was caused by possible abuse, by lack of discipline or inconsistent discipline, by poor parenting, including poor modeling behavior, and simply by a lack of consistency in his schedule.

Further, although he appeared in the record to have difficulty playing games or sports with rules, at the hearing, Plaintiff testified he played organized football and baseball on teams. The ALJ actually questioned the mother separately regarding these organized, formal team activities, which she confirmed.

A "marked limitation" interferes seriously with the ability of a child to independently initiate, sustain, or complete activities. Based on all of the above, the undersigned cannot find substantial evidence supports the ALJ's determination that Plaintiff had a less than marked limitation in the domain of interacting and relating with others. He clearly developed and used language well, was beginning to prefer playmates and be able to socialize with children as well as adults. He could choose his own friends, initiate and participate in conversations, using increasingly complex vocabulary and grammar, and speak clearly enough that both familiar and unfamiliar listeners could understand what he was saying. He had close friends, although perhaps only one or two. He did not withdraw from people he knew, nor was he overly anxious or fearful of meeting new people or trying new experiences. He spoke intelligibly with fluency. He could carry on a conversation or ask for

assistance. On the other hand, he often used actions instead of words to express himself, did not share well, did not play cooperatively with other children, especially without adult supervision. ed in the regular classroom most of the time.

Even if substantial evidence does not support the ALJ's determination that Plaintiff's limitation in this domain was "less than marked," however, this is not reversible error, because the undersigned has already found substantial evidence supports the ALJ's conclusion that Plaintiff did not have either one "extreme" or two "marked" limitations in any domains. The undersigned therefore finds substantial evidence supports the ALJ's ultimate determination that Plaintiff does not have an impairment or combination of impairments that meet, medically equal, or functionally equal the listings, and has therefore not been disabled since the date the application was filed.

## V. RECOMMENDED DECISION

For the reasons above stated, I find that the Commissioner's decision denying the Plaintiff's application for Supplemental Security Income is supported by substantial evidence, and I accordingly recommend that the Defendant's Motion for Summary Judgment be **GRANTED,** the Plaintiff's Motion for Summary Judgment be **DENIED,** and this matter be dismissed and stricken from the Court's docket.

Any party may, within fourteen (14) days after being served with a copy of this Recommendation for Disposition, file with the Clerk of the Court written objections identifying the portions of the Proposed Findings of Fact and Recommendation for Disposition to which objection is made, and the basis for such objection. A copy of such objections should also be submitted to the Honorable Irene M. Keeley, United States District Judge. Failure to timely file objections to the

Proposed Findings of Fact and Recommendation for Disposition set forth above will result in waiver of the right to appeal from a judgment of this Court based upon such proposed findings and recommendation. 28 U.S.C. § 636(b)(1); United States v. Schronce, 727 F.2d 91 (4th Cir. 1984), cert. denied, 467 U.S. 1208 (1984); Wright v. Collins, 766 F.2d 841 (4th Cir. 1985); Thomas v. Arn, 474 U.S. 140 (1985).

The Clerk of the Court is directed to send a copy of this Report and Recommendation to counsel of record

Respectfully submitted this 27 day of July , 2012.

JOHN S. KAULL
UNITED STATES MAGISTRATE JUDGE